IN THE MATTER OF: C.P.
No. COA07-1485
Court of Appeals of North Carolina.
Filed April 15, 2008
This case not for publication
James N. Freeman, Jr., and Dennis Martin, for petitioner-appellee Yadkin County Department of Social Services.
Don Willey, for respondent-appellant mother.
Judy N. Rudolph, for respondent-appellant father.
Klein & Freeman, PLLC, by Marc S. Gentile, for guardian ad litem.
STEELMAN, Judge.
The trial court properly considered evidence of the prior investigations of C.P.'s family by the Department of Social Services in both Caldwell and Catawba Counties. The trial court's adjudication of neglect is supported by clear and convincing evidence that C.P. was not receiving proper care and supervision from his parents on the date of adjudication.

I. Factual and Procedural Background
The juvenile petition removing C.P. from his mother's custody follows an 18 April 2007 fatal single-car accident involving two brothers: C.P., age 7, and his brother, B.R., age 10, who was driving. When police responded to a 1:30 a.m. call regarding a vehicle "cutting circles in yards and hitting mailboxes," the driver took off, and a high speed chase ensued. Eventually, the vehicle ran off the road and hit a tree, killing B.R., who was unrestrained. C.P., believed to be wearing a seatbelt, suffered a lacerated spleen, fractured ribs and a dropped lung.
When police arrived at C.P.'s home to notify the family, his paternal grandmother("R.G." or "grandmother") answered the door. She was asleep at the time of the accident and unaware that the boys had left the house. Upon learning of B.R.'s death and that the officers were not there to serve a warrant on respondent father R.L.P., Jr. ("father"), she told them that the parents were in Wilkes County, North Carolina. Respondent mother R.R. ("mother"), the custodial parent, and the two boys had recently come to live with grandmother, where mother "[left] the kids with [grandmother] a lot[.]" C.P.'s grandmother remarked that the boys had left the house in the middle of the night, on a different occasion, not long before.
Later on 18 April 2007, the Yadkin County Department of Social Services ("petitioner" or "DSS") filed a juvenile petition alleging that C.P. was a neglected child. Citing the facts of the accident and subsequent investigation of C.P.'s home, DSS alleged that C.P. was neglected in that he did not receive proper supervision and lived in an environment injurious to his welfare. DSS noted in its petition that the family had a long history with child protective services in several counties. A non-secure custody order was entered and C.P. was removed from his grandmother's home.
Adjudicatory and dispositional hearings were held on 25 June 2007, 7 August 2007, and 27 August 2007. On 26 September 2007, nunc pro tunc 27 August 2007, the trial court adjudicated C.P. a neglected juvenile. Respondents mother and father appeal.

II. Standard of Review
The standard of review of the findings of fact in a juvenile proceeding is whether those findings are supported by clear, cogent, and convincing evidence. In re D.M.M., 179 N.C. App. 383, 385, 633 S.E.2d 715, 716 (2006). We review de novo whether the findings of fact support the court's conclusion that the child was neglected. Id.

III. Abandoned Assignments of Error
Respondents made 127 assignments of error related to both the adjudicatory and dispositional phases of the hearings. After challenging nearly all of the trial court's adjudicatory findings of fact, respondents failed to present arguments in their briefs regarding either the hearsay and constitutional claims on DSS involvement or the Yadkin County investigation into the events of 18 April 2007. These assignments of error are deemed abandoned. N.C. R. App. P. 28(b)(6) (2007). We note that mere reference to assignments of error 50-56 (regarding finding of fact 51) in mother's brief, without argument or authority, is insufficient to comply with Rule 28.
The scope of appellate review is limited to issues that are not only presented by assignment of error set out in the record on appeal but also through the citation of authority and argument in the party's brief. N.C. R. App. P. 10(a), 28(b)(6); In re P.M., 169 N.C. App. 423, 424, 610 S.E.2d 403, 404-05, (2005) . Among the findings of fact made by the court and deemed abandoned by respondents are the following:
40. One night during the period from March 14, 2007, to April 18, 2007, B.R. and C.P. left R.G.'s residence and went into a vehicle located in her yard. R.R. was spending the night in the home of R.L.P., Jr. and she was not in the residence on that night. R.G. was asleep and did not know the juveniles were not in the residence. While in that vehicle, the juveniles played the radio and turned on the lights.
41. In either the late night hours of April 17, 2007, or in the early morning hours of April 18, 2007, the juveniles removed vehicle keys from R.G.'s purse. The juveniles got into a vehicle different from the vehicle they had previously entered, and B.R. drove the vehicle away from the residence. R.G. was asleep and did not know the juveniles had left her residence in a vehicle. R.R. was again spending the night in the home of R.L.P., Jr. and [was] not in the residence on that night.
42. In the early morning hours of April 18, 2007, the North Carolina Highway Patrol in Yadkin County, North Carolina, received a report of a vehicle being driven carelessly and recklessly. Trooper Barker and Deputy Brandon Scott Shields of the Yadkin County Sheriff's Department responded to the report. While Trooper Baker [sic] was pursuing the vehicle, it wrecked.
43. Deputy Shields arrived at the scene of this automobile wreck between 2:00 A.M. and 3 A.M. on April 18, 2007. At this scene[,] he found B.R., a juvenile, ten years old, and C.P., a juvenile, seven years old, in the wrecked vehicle. B.R. had been driving the vehicle. B.R. was deceased. C.P. was found under the body of B.R. and he was alive. There were no adults in the vehicle.
44. C.P. was first taken to Hoots Hospital and then transferred to North Carolina Baptist Hospital. He suffered fractured ribs, a lacerated spleen and a lung injury as a result [of] the wreck. He was hospitalized for five days for treatment of these injuries.
45. Deputy Shields determined that the juveniles had been living in the home of their grandmother, R.G. He knew R.G. because he had been called to her house several times to answer calls involving domestic disputes.
46. Deputy Shields went to the home of R.G. After several attempts, Deputy Shields was able to get R.G. to come to the door of her house. R.G. was unaware that the juveniles, B.R. and C.P., had left her home.
47. R.G. initially stated that she did not know how to get in touch with R.R., the mother of both juveniles, or R.L.P., Jr., the father of C.P. However, upon being told of the death of B.R. and that the officers were not interested in serving any warrants on R.L.P., Jr., she told the officers that R.L.P., Jr. and R.R. were in Wilkes County, North Carolina.
48. Deputy Shields entered [R.G.]'s home and found several pieces of paper that had been burned lying on the floor of the juveniles' bedroom. R.G. stated that B.R. had problems before with lighting fires.
49. In the early morning hours of April 18, 2007, the Yadkin County Department of Social Services received a request from the North Carolina Highway Patrol to come to Hoot Hospital concerning a report of the fatality of a minor child in an automobile collision.
50. On April 18, 2007, the Yadkin County Department of Social Services accepted the report for investigation and initiated an investigation of the report.
51. This investigation revealed the following:
(a) The juveniles had left R.G.'s house a few nights before the fatal accident and on that occasion had gotten into a truck with a stick shift in the yard of the house.
(b) The juveniles may have intended to drive that vehicle but may have been prevented from doing so because it had a stick shift .
(c) R.R. was not in the home on either the first night the juveniles left the home or the night of the fatal accident.
(d) R.G. was asleep on both occasions when the juveniles left the home.
(e) B.R. had a history of starting fires in the houses where he resided and of roaming around at night. Both of the juveniles had a history of lack of supervision.
(f) The keys to the vehicle in which the fatal accident occurred had been taken from R.G.'s purse.
. . .
57. Ms. Fiore[, a licensed clinical social worker specializing in the treatment of abused and neglected children and children who have witnessed domestic violence,] diagnosed C.P. as suffering from disruptive behavioral disorder NOS, anxiety disorder NOS with features of post traumatic stress disorder, [encopresis], and mild mental retardation.
These findings are presumed to be supported by competent evidence and are binding on appeal. Id.

IV. Findings of Fact Challenged by Respondents
In their first argument, respondents challenge certain findings of fact on the basis that the findings relied on irrelevant and impermissibly prejudicial evidence concerning prior DSS involvement with the family. We disagree.
Respondents contend that testimony and records from Caldwell County and Catawba County DSS were not admissible. They argue that previous investigations by DSS in these two counties are irrelevant to the issue of neglect in April 2007. They further argue that the admission of such evidence was prejudicial because petitioner introduced prior reports that: (1) did not constitute abuse or neglect; (2) did not result in the filing of a juvenile petition; (3) did not establish an independent basis for C.P.'s removal; and (4) did not establish conduct by the juveniles that could have made the boys' actions on 18 April 2007 reasonably foreseeable. Finally, respondents argue that the trial court abused its discretion by affording significant weight to this evidence.
At the 25 June 2007 hearing, DSS sought to introduce testimony and records from the Caldwell County Department of Social Services ("Caldwell County") regarding its prior involvement with the family. Respondents objected on the grounds of relevancy, arguing that the scope of the adjudication hearing was limited to the events of 18 April 2006 and that any previous DSS cases, if closed, were irrelevant. In response, DSS argued that:
[T]his case is based in large part upon the history of this family and what they knew about these boys [C.P. and B.R.] and what they knew about these boys' condition and what they knew about the boys' predilection . . . to do the things that they did that ended up resulting in [B.R.'s] death. So, I believe what the family knew and when they knew it, is very important in determining whether there was neglect in this case.
The trial court allowed the testimony, stating:
[T]he juvenile petition . . . does mention that this plea [sic] has had a long chalked up services history in Caldwell County and Catawba and it includes substantiations, in need of services[.] [B]ased on Mr. Martin's argument, the court will overrule the objection. The court will obviously give the evidence the weight that the court deems is needed. I will reserve the right to give the evidence little weight, no weight or quite a bit of weight.
Respondents' objection at trial was made at the beginning of the Caldwell County evidence, was not renewed during testimony by Catawba County social workers, and was limited to "unsubstantiated reports" and previous cases that were "closed." A careful review of the record reveals that Caldwell County worked with the family between January 2003 and January 2004, when DSS closed the case. The case remained closed for several weeks, until 17 February 2004, when a new report, for inappropriate discipline by respondent father, was received. This report was later substantiated. From February 2004 until April 2007, DSS worked with the family in Caldwell, Catawba, and Yadkin Counties. We hold that respondents' objection, as stated, was sufficient to preserve for appellate review the admissibility of the Caldwell and Catawba County DSS records during the limited time frames when there was no open case in either Caldwell or Catawba Counties. N.C. R. App. P. 10(b)(1) (2007). The objection was insufficient to preserve an objection to evidence of interactions with either Caldwell County or Catawba County DSS between February 2004 and April 2007. We thus limit our review to the evidence that supported findings of fact 11-15.
We first note that findings 11-12 and 14-15 are immaterial to the outcome of the case. There are other findings, supported by competent evidence, containing the same or similar findings as these. Finding of fact 13 states:
13. . . . During this time B.R. had been getting up at night. On one occasion B.R. tried to unlock a door in the hall of his home. To prevent B.R. from getting up at night, [respondents] began sleeping on mattresses in the living room of their residence. The Caldwell County Department of Social Services provided the family with a door alarm to put on the juveniles' bedroom door. However, in subsequent home visits, social workers from the Caldwell County Department of Social Services never saw the door alarm installed.
The rules of evidence in civil cases apply in all cases where a juvenile is alleged to be abused, neglected, or dependent. N.C. Gen. Stat. § 7B-804 (2005). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2005).
The issue before the trial court was whether the parents' actions or inactions constituted neglect of C.P. To prove neglect, DSS sought to show not only a history of a lack of parental supervision but that C.P.'s parents knew of safety risks inherent in leaving the boys with C.P.'s grandmother, and nonetheless chose to leave them in an injurious environment. There was clear and cogent evidence that the mother knew that the boys had recently "snuck out" in the middle of the night to get into a truck in their grandmother's yard. On the night of the fatal accident, the boys "snuck out" and took a car. In light of these uncontroverted facts, evidence that there had been prior incidents warranting an alarm for B.R.'s door was clearly relevant to show that respondents had knowledge of the boys' behaviors and whether they received appropriate supervision. We hold that this evidence was relevant to the issue of whether respondents knew of the risks inherent in leaving C.P. in his grandmother's care and, consequently, to the issue of neglect.
Respondents' argument is without merit.

V. Adjudication of Neglect
In their second argument, respondents contend that the trial court erred by adjudicating C.P. a neglected juvenile because "mere accidental injuries" cannot be the basis for neglect. Respondents assert that the accident in which C.P. was injured was unforeseeable and that the court improperly relied upon immaterial and irrelevant evidence of prior DSS involvement. We disagree.
"Neglected juvenile" is defined in N.C. Gen. Stat. § 7B-101(15) as:
[a] juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C. Gen. Stat. § 7B-101(15) (2005).
Parental conduct that rises to the level of "neglect" has been described by our Supreme Court as "either severe or dangerous conduct or a pattern of conduct either causing injury or potentially causing injury to the juvenile." In re Stumbo, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003).
A "neglected juvenile" is defined in part as one "who does not receive proper care, supervision, or discipline from the juvenile's parent . . . or who lives in an environment injurious to the juvenile's welfare." N.C.G.S. § 7B-101(15) (2001). In order to adjudicate a juvenile neglected, our courts have additionally "required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide `proper care, supervision, or discipline.'" In re Safriet, 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (quoting former N.C.G.S. § 7A-517(21) (1989)), quoted in Helms, 127 N.C. App. at 511, 491 S.E.2d at 676.
Our review of the numerous cases where "neglect" or a "neglected juvenile" has been found shows that the conduct at issue constituted either severe or dangerous conduct or a pattern of conduct either causing injury or potentially causing injury to the juvenile.
Stumbo, 357 N.C. at 283, 582 S.E.2d at 258. In reviewing parental conduct, the court considers the totality of the evidence.In re L.T.R., 181 N.C. App. 376, 384, ___ S.E.2d ___, ___ (2007).
In the instant case, there was ample evidence before the district court of a pattern of conduct by respondents that imperiled C.P. There was competent evidence that: (1) although she initially expressed disbelief at a report that C.P.'s eldest brother had sexually abused both C.P. and B.R., mother knew of the sexual contact yet did not take appropriate steps to address the issue; (2) although mother agreed to a safety plan to prevent contact between the two younger boys and the older brother who sexually abused them, C.P. and B.R. were found with the brother shortly thereafter; (3) mother knew about the boys' late-night venture into a truck and continued to leave them in the care of their grandmother in order to be with C.P.'s father; (4) despite B.R.'s known "problems with lighting fires," cigarettes, burnt matches, and burned papers were found in the boys' bedroom following the accident; and (5) father's conduct, including inappropriate discipline, reflected untreated alcoholism and mental health issues. Father offered no evidence of treatment for these issues; to the contrary, there was evidence that both parents did not follow up on offered services and did not ensure C.P.'s school attendance.
The district court made extensive findings of fact based on this evidence, which was both relevant and material to the issue of proper parental care and supervision. These findings show that C.P.'s physical, mental, and emotional well-being was, at a minimum, at substantial risk of being impaired because of improper care. Conversely, there was little evidence before the court from which to find that either parent provided C.P. with proper care, supervision, or discipline. Despite all attempted services and repeated interventions with the family, from the time that the boys were moved to Yadkin County to the night in question, respondents continued to rely on others to provide parental care and supervision to C.P. and B.R., leaving both juveniles in a potentially injurious environment, even after learning that the boys had left the house and gained access to a truck while their grandmother slept. Consequently, C.P. suffered serious personal injuries in the fatal automobile accident.
The court's findings of fact, supported by clear and convincing evidence, support a conclusion that: (1) the physical and mental harm suffered by C.P. was a direct and foreseeable consequence of his parents' failure to provide proper care, supervision, or discipline, and (2) at the time of the petition, C.P. was neglected within the meaning of N.C. Gen. Stat. § 7B-101(15), in that he was not receiving proper care and supervision from his parents. For these reasons, we hold that the district court did not err in adjudicating C.P. neglected at the time of the petition. This argument is without merit.
Pursuant to N.C. R. App. P. 28(b)(6) (2007), the remaining assignments of error are deemed abandoned.
AFFIRMED.
Judges CALABRIA and STEPHENS concur.
Report per Rule 30(e).